# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 2, 2001 Session

## OLALEE HERRON McCLARAN  v. DON M. McCLARAN

**Appeal from the Chancery Court for Rutherford County**
**No.   98CV-239    Don R. Ash, Judge**

---

### No. M2000-01666-COA-R3-CV - Filed August 13, 2001

---

Plaintiff Olalee Herron McClaran sues her son, Defendant Don M. McClaran, seeking compensatory and punitive damages for his mishandling of funds coming into his hands as her attorney in fact in connection with the sale of certain real estate.  The jury awarded both compensatory and punitive damages, resulting in this appeal wherein Mr. McClaran complains of the exclusion of evidence, the Trial Court's directing a verdict as to two claims in his counter-complaint, the seating of a six-person, rather than a 12-person jury, and the excessiveness of the punitive damage award.  We affirm.

### Tenn.R.App.P. 3; Judgment of the Chancery Court Affirmed;
### Cause Remanded

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which Ben H. Cantrell, P.J. (M.S.), and William B. Cain, J., joined.

August C. Winter, Brentwood, Tennessee, for the Appellant, Don M. McClaran

Terry A. Fann, Murfreesboro, Tennessee, for the Appellee, Olalee Herron McClaran

### OPINION

Olalee Herron McClaran sues her only living child,[1] Don M. McClaran, who represented himself at trial in connection with his handling of certain funds as attorney in fact for her, which came into his hands upon the sale of certain real estate she owned.  Her suit seeks an accounting from him as to the proceeds of the sale, a judgment for funds wrongfully converted by him, and punitive damages for his wrongful acts.

---

[1]        Her firstborn son died in infancy.

A six-person jury was demanded and, after deliberation, it found that the Son had violated his fiduciary obligations to his mother and wrongfully converted her property. It then awarded the Mother $261,009.97 for compensation for property converted, plus pre-judgment interest at the rate of five percent, and also punitive damages in the amount of $175,000. The Son appeals, questioning the exclusion of two pieces of evidence, the granting of motions for directed verdict as to his counter-complaint for breach of contract and *quantum meruit.*

By instrument dated October 12, 1995, the Mother granted to the Son a general power of attorney. Acting upon this authority the Son negotiated a sale of 14.880 acres owned by the Mother to a development company. The consideration for this sale was $2,247,700, of which amount, $472,526 was paid to the IRS for federal taxes owed as a result of the sale.

The Mother repeatedly sought to learn from the Son the disposition of the balance of the purchase price, the only answer she ever received from him was, "I took care of it." Becoming increasingly concerned, the Mother, by instrument dated November 19, 1997, revoked the power of attorney.

Although no argument is made by the Son as to the sufficiency of the evidence before the jury to justify its action, we deem it appropriate to copy certain facts contained in the Mother's brief which are supported by material evidence:

> After the sale of her property, Ms. McClaran moved to 5760 Lytle Creek Road into a house with 36 acres which cost Two Hundred Sixty-Seven Thousand Nine Hundred Twenty-Five Dollars ($267,925.00). The house and land were deeded in her name. She lived at that location approximately two and one-half (2 ½ ) months with her son (the Appellant) and his girlfriend. The neighboring house and five (5) acres were later purchased at the location known as 5750 Lytle Creek Road. The purchase price for that property was One Hundred Fifty Thousand Dollars ($150,000.00), but it was deeded in the sole name of the Appellant, Don McClaran. Ms. McClaran did not give this property to him, and it was purchased with her money. The purchase occurred on December 6, 1996. Ms. McClaran moved into that home in late April or early May 1997. It was just down the lane from 5760 Lytle Creek Road where her son and his girlfriend continued to live.

> After her move to Lytle Creek Road, Ms. McClaran had a hard time finding out how much money she had and what her son was spending her money on. Even though Ms. McClaran asked her son "many, many times", he would not tell her how much money he was spending, would not show her bank statements, and always said: " I took care of it." Several improvements were made to the properties including a new gravel driveway, the construction of a fence and barn, and other items which were necessary improvements. However, Ms. McClaran never told her son that he could have her money, that he could take her money as

a gift, or that he could title the 5750 Lytle Creek Road property in his name and use her money to pay for it.

Finally, in 1997, after being frustrated by not being able to get answers from her son as to how much money she had and what it was being spent on, Ms. McClaran went to see the attorney who closed the land transaction. She was able to obtain copies of the four (4) checks from the closing attorney which were all made payable to her, but she could not find the money. When Ms. McClaran asked her son about the money, his response was: "I took care of it."

On November 19, 1997, Ms. McClaran decided to revoke the Power of Attorney which her son was using to continue spending her money. "I couldn't get no information out of him. He was giving everything away, and I had nothing." Ms. McClaran felt betrayed. "I couldn't trust him after he deceived me."

The Appellant and his girlfriend continued to live on Ms. McClaran's property located at 5760 Lytle Creek Road. The Appellant and Ms. Weeks lived there together from January 1997 through January 1998 when Ms. Weeks left him. The Appellant continued to live there through the summer of 1998, and never paid any rent.

Before moving to 5760 Lytle Creek Road, and after leaving that location, the Appellant lived at 815 Trinity Drive in Murfreesboro with Ms. Weeks. He purchased that home in his sole name in April 1984 for approximately Eighty-Five Thousand Dollars ($85,000.00).

From the proceeds of the sale of his mother's property, the Appellant paid off the mortgage on his Trinity Drive home in the approximate amount of Seventy-Five Thousand Dollars ($75,000.00). He paid off his home mortgage within sixty to ninety (60-90) days after Ms. McClaran's property was sold. The current appraised value of his Trinity Drive home is One Hundred Thirty-Five Thousand Dollars ($135,000.00).

Within three (3) weeks of the sale of Ms. McClaran's property, the Appellant purchased a tract of unimproved property on Webb Road for the sum of Twenty Thousand Five Hundred Dollars ($20,500.00). The deed to that property was in the Appellant's sole name. He bought the property from his son and daughter-in-law.

Ten (10) days later, on December 6, 1996, the Appellant purchased the property at 5750 Lytle Creek Road with the proceeds from the sale of his mother's

land and deeded the property in his sole name. He did not report to the I.R.S. the 5750 Lytle Creek Road property as a gift from his mother in 1996, 1997, or 1998.

The Appellant continued to spend Ms. McClaran's money in 1997 and 1998 by paying off his debts and giving money to his fiancé and children, and making many purchases, only some of which benefited Ms. McClaran. The Appellant bought himself a Chevrolet pickup truck for Nine Thousand Five Hundred Dollars ($9,500.00). He bought himself another Toyota pickup truck, and both of the vehicles were titled in his sole name. He paid off a debt on his "Wendy's property" in the amount of Fifty-Eight Thousand Eighty-Eight and 40/100 Dollars ($58,088.40). He wrote checks to himself totaling Nineteen Thousand Seven Hundred Dollars ($19,700.00), and checks to his fiancé, Marie Weeks, totaling Forty-Nine Thousand Two Hundred Fifty Dollars ($49,250.00). He wrote one check to Ms. Weeks in August 1997 for the sum of Twenty-Five Thousand Dollars ($25,000.00).

The Appellant used Ms. McClaran's money to pay off the debts of his sons to First Family Financial, Ford City Bank, The Associates, Sears, and used Three Thousand Eight Hundred Ninety-Five Dollars ($3,895.00) to pay off a credit card debt for his son. He used his mother's money to buy stock through Chicago Trust and the Genesis Fund. He used the money to pay Murfreesboro City and Rutherford County property taxes on his home on Trinity Drive. He used the money to repaint and re-carpet his Trinity Drive home.

The Appellant used Ms. McClaran's money to give a gift of Fifteen Thousand Three Hundred Dollars ($15,300.00) to his son and daughter-in-law. He used the money to pay his state income tax in 1996 and his federal income taxes. He wired over Eight Thousand Five Hundred Dollars ($8,500.00) to his son through a Texas bank. He paid for a trip to Branson, Missouri, using his mother's money. The Appellant paid his HBO Direct bill, American Express, and insurance premiums using these funds.

The Appellant also used Ms. McClaran's money to pay his own legal fees to fight Ms. McClaran in Court. He paid his first attorney, Guy Dotson, Sr., Four Thousand Five Hundred Dollars ($4,500.00) in legal fees from this account, attorney Larry Brandon One Thousand Dollars ($1,000.00), and attorney Laurie Young Three Thousand Seven Hundred Fifty Dollars ($3,750.00).

One of the main complaints Ms. McClaran had was that she had no documentation and no knowledge of how her money was being spent. The Appellant did not keep records of the expenditures he made, and objected to providing bank records to his mother and her attorney. In fact, the Appellant contested financial subpoenas, and Ms. McClaran was forced to go to Court and

get a Court Order just to see bank records on the accounts where her money was originally deposited. When asked about giving financial documents to his mother, the Appellant answered: "I didn't want to give it to you. I don't think you deserve them today." However, the Appellant did admit that he did not keep up with how he spent the money "as good as I should have."

The Son appeals, raising the following five issues:

1. WHETHER THE ERRONEOUS EXCLUSION OF EVIDENCE THAT DON MCCLARAN HAD ALLOWED HIS MOTHER TO CONVEY HIS LAND IN HER NAME AFFECTED THE OUTCOME OF THE TRIAL.

2. WHETHER THE ERRONEOUS EXCLUSION OF EVIDENCE THAT THE PARTIES HAD MADE AN ORAL CONTRACT WHICH PROVIDED DON MCCLARAN WITH A LIFE ESTATE INTEREST IN THE PROCEEDS FROM THE SALE OF THE OLD FORT PARKWAY PROPERTY AFFECTED THE OUTCOME OF THE TRIAL.

3. WHETHER THE TRIAL COURT ERRED IN GRANTING MOTIONS FOR DIRECTED VERDICT ON DON MCCLARAN'S BREACH OF CONTRACT AND QUANTUM MERUIT COUNTERCLAIMS WHERE THERE WAS PART PERFORMANCE OF THE CONTRACT BY DON MCCLARAN, UNJUST ENRICHMENT AND DEMONSTRABLE DAMAGES.

4. WHETHER A COUNTERCLAIM PRESENTING NEW ALLEGATIONS OF THE EXISTENCE OF AN ORAL CONTRACT BETWEEN THE PARTIES WHICH THE PLAINTIFF BREACHED IS A PLEADING RAISING ISSUES OF FACT AS DEFINED BY TRCP 38.02.

5. WHETHER A PUNITIVE DAMAGES AWARD OF $175,000, WHICH, WHEN ADDED TO THE $261,000 COMPENSATORY DAMAGES AWARD ESSENTIALLY STRIPS MR. MCCLARAN OF HIS NET WORTH, IS EXCESSIVE.

As to the first issue, the Son attempted to place in evidence a deed purportedly signed by his mother for .83 acres of the property sold, which was acknowledged before his fiancé, Marie Weeks. The Mother denied ever executing the deed. However, this was not the reason the deed was excluded as such a conflict would be a question for the trier of fact, but on the ground that the Son, acting in his capacity as attorney in fact, signed a warranty deed for his mother conveying the 14.880-acre tract which included the .83 acres the Son contended had been deeded to him.

Additionally, this issue is not raised in the Son's pleadings which consisted of his "ANSWER," "AMENDED SUPPLEMENTAL ANSWER AND COUNTER PETITION," and

"AMENDED SUPPLEMENTAL ANSWER AND AMENDED COUNTER PETITION." Moreover, the Son's amended supplemental answer and amended counter-complaint affirmatively alleges that the 14.880-acre tract was owned by the Mother. Still further, the Son paid no federal gift tax in connection therewith.

Based on the deed to the 14.800 acres, the Mother insists that the Son would be estopped to insist that he was the owner of the property described in the unrecorded deed. While we question whether the doctrine of estoppel[2] would apply to the facts surrounding the .83 acres, we conclude under the facts above enumerated the Trial Judge was correct in excluding the evidence.

In deciding the second issue the Trial Court apparently held that the evidence sought to be introduced violated the Statute of Frauds, requiring transfer of interest in realty to be in writing. The Son argues, however, that it is the proceeds from the sale, which are personalty, and not within the ambit of the Statute of Frauds in which he claims an interest.

While we are not prepared to say that the Son's insistence is without merit, we do note that the jury found as to the one issue the jury decided as to the Son's counter-complaint that the Mother did not make any gift to the Son and necessarily found that he was not credible in his testimony that she had. We think the evidence proposed to be introduced relative to a contract for a life estate would have been found by the jury against the Son.

Finally as to the first two issues, we note trial judges are clothed with broad discretion in accepting or rejecting evidence and will not be found in error absence of a showing of abuse. Otis v. Cambridge Mutual Fire Insurance Company, 850 S.W.2d 439 (Tenn.1992). Under the facts developed in this case we find no abuse of discretion in the Trial Court's actions relative to exclusion of evidence.

The Trial Judge granted motions for directed verdict as to the Son's breach of contract and *quantum meruit* claims on the ground that he did not prove the amount of damages he suffered flowing therefrom. Our reading of the record persuades us that in this respect the Trial Judge acted properly. Moreover, we note that in Mr. McClaran's closing argument he told the jury with respect to the one claim he had which was still viable, that of a gift of money or property from his mother, he was only seeking one dollar in damages rather than the $500,000 contained in his ad damnum clause.

---

[2] The doctrine of estoppel in its simplest form decrees that A may not make a misstatement to B, which B relies upon to his detriment, and thereafter assert the truth. In the case on appeal it cannot be said that the Mother relied upon the representation by the Son as attorney in fact in the deed conveying the 14.880 acres because the Mother herself knew the true facts. In the context of this case an estoppel would arise should the Son attempt to assert his ownership of the .87 acres against the development company.

Apropos of issue four, a six-person jury was demanded in the original complaint filed by the Mother. The original answer filed by the Son did not contain any jury demand. Thereafter, the Son was allowed to supplement his answer, which still did not demand a jury. However, the supplemental pleadings did include a counter-complaint which, for the first time, demanded a 12-person jury.

Under Tenn.R.Civ.P. 38 it is only when an amendment to pleadings creates a new issue is a party entitled to a jury trial. The Trial Court found in this case that no new issue was presented and declined to permit a 12-person jury. We agree with the Trial Judge that the supplemental counter-complaint did not raise new facts which would validate the Son's jury demand. Still further, it would appear that if the Son's jury demand for a 12-person jury was valid, it would only apply to his counter-complaint as no such demand was made in his answer. Because we have found the Trial Court acted properly in directing a verdict as to his contract and *quantum meruit* claims, that issue has been rendered moot as to those claims.

Finally, insofar as the first four issues are concerned, we find in light of the entire record, including the findings of the jury, that had the Court committed any of the errors assigned they would be harmless and would not have more probably than not affected the judgment. Tenn.R.App.P. 36.

As to the last issue, regarding punitive damages, our Supreme Court, in Hodges v. S. C. Toof & Co., 833 S.W.2d 896, 900 (Tenn. 1992), articulated the standard for adjudging punitive damages and the factors to be considered in making such an award:

> As stated earlier, Tennessee presently allows punitive damages in cases involving fraud, malice, gross negligence, oppression, evil motives, conscious indifference, and reckless conduct implying "disregard of social obligations."
>
> . . . .
>
> If the fact finder finds a defendant liable for punitive damages, the amount of such damages shall then be determined in an immediate, separate proceeding. During this second phase, the fact finder shall consider, to the extent relevant, at least the following:
>
> (1) The defendant's financial affairs, financial condition, and net worth;
>
> (2) The nature and reprehensibility of defendant's wrongdoing, for example
> (A) The impact of defendant's conduct on the plaintiff, or
> (B) The relationship of defendant to plaintiff;

(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

The trier of fact shall be further instructed that the primary purpose of a punitive award is to deter misconduct, while the purpose of compensatory damages is to make plaintiff whole.

We think it appropriate at this time to detail the egregious acts committed by the Son, which are contained in the brief of the Mother and are fully supported by the proof introduced:

TESTIMONY OF DAISY SCHLEGEL (Friend of Mother)

A:  And we were going up to the building where her stuff was stored.  And we drove up there, turned around, Don came out there and told us we [had] no business there, for us to leave.  And I said, Well, we just want to get a hose out of the building so she doesn't have to carry the water so far.

And he said, I said to leave.  And I asked granny if she wanted to leave and she said, well, I would like to get a hose.  Well, he went–turned around, walked away, and he came back with about a seven or eight-foot steel T-post.

Q:  Fence post?

A:   Fence post, yes.  And we were in her truck.  I had drove down to her house and we left my car at her house and drove down to the building in her truck because we were going to get food for the animals.  And Don came up in front of the truck and he stood with this T-post drawn back like that (indicating) and he said, I said to leave.  And I just sat there.  I asked granny, talking to granny, seeing if she wanted to leave.

And he said, I said to leave.  And he stood in front of the truck like he was-- and was going to throw the fence post through the windshield.  And granny just said, I don't know.  She says, I'm scared of him.  And so we just sat there.  We were afraid to move the truck.

Q:   Was it obvious to you, looking at Ms. McClaran, that she was afraid of him?

A:   She was definitely afraid, yes.

Q:   And this was the time that he was still living out there at 5760?

A:   Yes.

Q:   Okay.

A:   In the house, yes.

Q:   All right.  And did he make any other threatening remarks to you or to Ms. McClaran?

A:   Yes.  He walked up beside the truck right here next to me and I rolled down the window and he said, I said to leave.  And I says, Don, why won't you let your mother have the hose?  And he said, I will kill you when I get you alone.

## TESTIMONY OF MOTHER

Q:   You wanted to tell the jury when we took our break a while ago how this over the last couple of years has affected your life, now is your chance to tell them just that.

A:   I have to stand up.  My legs are so short.  Is it all right if I stand up?

THE COURT:   Yes ma'am.

A:   Well, this has affected my life and shortened my life because I couldn't do the things that I used to do or wanted to do or had to do.  And I'm afraid of him.

I'm deathly afraid of him because after the incident up at my house and everything, he beat me up and then throwed me out on the concrete. And I called the law and they come out there and they went up there. I don't know what they said to him, but they made a record of it.

And then a few days after that, the mama cows and the baby calves got separated because the wind had blown the gate to. And so I went down there and walked the road down there so I could open the gate so they could get together. He come in in the red truck and he stopped. And when he stopped he looked over at me like a wild man, and he said, You ought not to be living, you old hussy you. And then he drawed his arm back and put him arm back like that over the truck, and then he said, You low down, trifling old hussy, you ought to be dead; and he put it back over here. And then the third time he did that he said, Marie is leaving me on account of you, you low down, trifling old hussy, you, she's leaving me. I haven't answered that yet.

Q:   How did that affect you, Ms. McClaran? You wanted to tell --

A:   Tore me all to pieces just to think I raised him and that's all the respect and love he has for me.

. . . .

A:   I went up there to feed the little pets and he is out in the yard. And I said, Don, I've worked hard today. Just as soon as I get through feeding the little pets I said, you or Marie one can take me back down to the house. I won't tell you what he said to me. And I went in my house then and told them I was ready to go home. And he said, you know how you got here. You go back the same way, but some dirty words in between them.

Q:   Some curse words?

A:   Dirty words. And I called Scott. He had been coming out, my oldest grandson, but he wasn't coming. He was taking the kids – to pick them up at the sitter. So I was going out the door there, between the kitchen and the door to go out and Don grabbed me and beat on me and twisted my arm and twisted my neck which I still suffer from my neck and twisted the blood out of my arm and deliberately picked me up and threw me out in the concrete. So that's the way the story is.

Q:   Did you attack him?

A:   I had nothing to do with nothing.  I had a little cap on.  I kept doing that way at him (indicating).  But, no, he kept beating me in the back and everything and calling me names.

    . . . .

## CROSS-EXAMINATION BY SON

Q:   Tell me about how I beat you up Grandmother.  Tell me about how I beat you up and everything.  Tell me all of the times that I have beat you and physically abused you, Grandmother.

A:   Really you know without being told.  You know I went down there to feed the little pets and animals and you were in the yard.  And I said I've worked hard today and whenever I got through feeding them, I said, you or Marie one can take me back to the house.  You never said a word.  You went in the house.  And when I got through I went in the house and you and Marie were laying up in the bed at 4:00 in the evening.  And I turned to you and I said, I'm ready to go.  And you said, you know how you got here and you take your so and so thing back to the house like you got here.

    Then I turned and went into the living room where another phone was.  I called Scott and Scott said that he wasn't coming out, that he was going to take the kids – pick up the kids up at the sitter.  Well, that was it.  When I went out my leg kind of give way and you jumped up off that bed and you beat me up, head to foot you did.  And you know you did.  And then through the little hall there you deliberately picked my body up and throwed me out on the concrete.  Twisted my arm, and my neck still bothers me where you beat me in the back and twisted my neck.

    . . . .

Q:   You think that I hit you with my fist also?  Have you stated that --

A:   You were beating on me and my shoulders and everything.

Q:   Did I give you a black eye?

A:   I don't think you hit me in my eye but you sure did my shoulders and twisted my little arms and everything.  By the time I got back down to the house I was bloody as a hog.

-11-

With regard to the Son's net worth, the record discloses that he is the owner of the following real estate which is unencumbered:

1. House on Trinity Drive - $ 113,600.00

2. Webb Road property -        31,800.00

3. Wendy's property -        934,700.00
   _____

   Total        $1,080,100.00

It is true that as to the Wendy's property, the Son testified it was under lease with an option to purchase for the sum of $267,100. The lease, however, was never produced and, had an objection been made, the Son's statement would have been excluded under the Best Evidence Rule. Nonetheless, the jury under the charge of the Court,[3] having found the Son untruthful as to the issues presented to it with regard to a gift from the Mother, could also have found that he was untruthful regarding the option. Indeed, a former business partner testified at the bifurcated hearing as to punitive damages, the following:

> Q    All right, sir. Mr. Posey, do you know Mr. Don McClaran who is sitting at counsel table to my left?
>
> A    Know him well.
>
> Q    How long have you known Mr. McClaran?
>
> A    Since 1977, when I came into the real estate business.
>
> Q    And have you had business relationships with Mr. McClaran in the past?
>
> A    Yes. He and I were business partners at one time.
>
> Q    And based upon your knowledge of Mr. McClaran for the last 23 years and your relationships with him, do you have an opinion as to his reputation of character for truthfulness or untruthfulness?
>
> A    Oh, yes.
>
> Q    And would you please state that opinion to this jury?

---

[3]    You may conclude that a witness deliberately lied about a fact that is important to your decision in the case. If so, you may reject everything that witness said. On the other hand, if you decide that the witness lied about some things but told the truth about others, you may accept the part you decide is true and you may reject the rest.

A     I would say that he is the most accomplished liar that I have ever met in my life and totally dishonest.

Finally, as to issue five, even if we accept the fact that the Wendy's property was under option to be sold for $267,100, the Son would still have unencumbered real estate of the value of $412,500 in addition to certain personal property in the form of vehicles, the value of which was not shown in the record.

For the foregoing reasons the judgment of the Trial Court is affirmed and the cause remanded for collection of the judgment and costs below.  Costs of appeal are adjudged against Don M. McClaran and his surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE